UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCINDA JACKSON,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>FANDOM, INC.,<br><br>　　　　Defendant. | Case No. 22-cv-04423-JST<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: ECF No. 20 |

Before the Court is Defendant Fandom, Inc.'s motion to dismiss. ECF No. 20. The Court will deny the motion.

## I.   BACKGROUND[1]

Plaintiff Lucinda Jackson is a registered user of Fandom, a gaming and entertainment website. ECF No. 11 ¶¶ 19, 28. To create an account with Fandom, Jackson provided personally identifiable information ("PII"), including her name and email address. *Id.* ¶ 20. Fandom hosts prerecorded video content, which Jackson has viewed. *Id.* ¶ 29. Jackson is also a registered user of social media networks Facebook and Instagram, which she accesses on the same device and browser as she uses to access Fandom. *Id.* ¶¶ 21-24.

Unbeknownst to Jackson, Fandom transmits users' viewing information to Meta Platforms, Inc. using a tracking tool called the Meta Pixel. *Id*. ¶¶ 30, 36. Websites like Fandom "use the Pixel to collect analytical data about how users use its website and in turn, are able to target more specific ads to their users." *Id*. ¶ 37. By incorporating the Pixel in its website code, Fandom also transmits user-specific information—including the user's IP address, name, email, or phone

---

[1] For the purposes of deciding the present motion, the Court assumes the truth of the facts alleged in the amended complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

1  number; the title of videos the Fandom user watches; and that user's Facebook Profile ID—to

2  Meta, which owns Facebook and Instagram. *Id.* ¶¶ 4-6, 30. A Facebook Profile ID is a unique

3  identifier which anyone can use to locate a particular user's Facebook profile, which in turn "may

4  contain [the] user's name, gender, birthday, place of residence, career, educational history, a

5  multitude of photos, and the content of a [the] user's posts." *Id*. ¶¶ 6, 34.

6  Jackson filed this action on behalf of herself and a putative class of individuals who

7  viewed video content on Fandom, asserting that Fandom's data-sharing practices violate the Video

8  Privacy Protection Act ("VPPA") and that Fandom was unjustly enriched by these practices. *Id.*

9  ¶¶ 50, 60-72, 73-77. Fandom now moves to dismiss the first amended complaint. ECF No. 20.

## II.   JURISDICTION

This Court has jurisdiction over Jackson's federal law claim under 28 U.S.C. § 1331 and has supplemental jurisdiction over Jackson's state law claim under .28 U.S.C. § 1367(a).

## III.   LEGAL STANDARD

"Dismissal under [Federal Rule of Civil Procedure] 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Facts pleaded by a plaintiff "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## IV. DISCUSSION

### A. Incorporation by Reference or Judicial Notice

Fandom requests that the Court find several webpages from its website, including its Terms of Use and Privacy Policy, incorporated by reference into the first amended complaint. In the alternative, Fandom argues that the Court may judicially notice the documents.

None of these documents is incorporated by reference into the first amended complaint. A document is properly incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "'Extensively' . . . should, ordinarily at least, mean more than once." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (quoting *Ritchie*, 342 F.3d at 907). Jackson does not refer to any of the webpages in the first amended complaint, and only mentions the Terms of Use and Privacy Policy once. None of these documents forms the basis of either of Jackson's claims. Accordingly, Fandom's request for incorporation by reference is denied.

Further, none of these documents is judicially noticeable. A court may judicially notice a fact "not subject to reasonable dispute," meaning the fact is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "The simple act of posting something publicly on the Internet is insufficient assurance of an exhibit's accuracy." *Cappello v. Walmart Inc.*, No. 18-cv-06678-RS, 2019 WL 11687705, at *3 (N.D. Cal. Apr. 5, 2019). This is especially true where, as here, it is unclear whether the webpages, Terms of Use, and Privacy Policy submitted by Fandom are the same versions that may have been available to Jackson when she registered as a user. Fandom's request for judicial notice is therefore denied.

### B. VPPA Claim

The VPPA generally prohibits qualifying video tape service providers from knowingly disclosing their consumers' PII. 18 U.S.C. § 2710(b)(1). Disclosure of such PII is permitted only in certain contexts, including where the disclosure is made "with the informed, written consent . . . of the consumer . . . in a form distinct and separate from any form setting forth other legal or

3

financial obligations of the consumer," 18 U.S.C. § 2710(b)(2)(B), and where the disclosure is "incident to the ordinary course of business of the video tape service provider," 18 U.S.C. § 2710(b)(2)(E). "[T]o plead a plausible claim under [S]ection 2710(b)(1), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any c[onsum]er' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by [S]ection 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

Fandom moves to dismiss Jackson's VPPA claim, arguing that Fandom is not a qualifying video tape service provider, Jackson is not a qualifying consumer, Jackson fails to allege any disclosure of qualifying PII, and any such disclosure occurred incident to the ordinary course of business.

### 1. Video Tape Service Provider

A video tape service provider is any entity "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

While Fandom does not rent, sell, or deliver video cassette tapes, Jackson alleges that Fandom is "engaged in the business of delivering audiovisual materials that are similar to prerecorded cassette tapes" and that she viewed such videos on Fandom's website. ECF No. 11 ¶¶ 64, 29. "Courts have generally construed 'similar audio visual materials' broadly, finding that streaming video delivered electronically falls within that definition." *Stark v. Patreon, Inc.*, --- F. Supp. 3d ----, No. 22-cv-03131-JCS, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022). Because Fandom is a website that hosts prerecorded streaming video content, Fandom qualifies as a video tape service provider under the VPPA.

Fandom argues that, because it provides access to all of the materials on its website for free, it is not engaged in the business of providing video content. However, video-hosting websites need not charge fees to viewers to qualify as video tape service providers under the VPPA. *In re Hulu Priv. Litig.*, No. 11-03764 LB, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) ("*Hulu I*") (holding that a video streaming website is a video tape service provider, even

4

though plaintiffs did not pay for streaming services). "[F]or the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (noting that a letter carrier who physically delivers a videotape is not "'engaged in *the business*' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package" (emphasis in original)). Jackson alleges that she viewed prerecorded video content that Fandom provides on its website. Taking the facts alleged in the complaint as true, the Court can reasonably infer that Fandom's website is tailored to deliver video content to viewers. *See Stark*, 2022 WL 7652166, at *7 ("Drawing all reasonable inferences in [plaintiff's] favor for the purpose of the present motion, it is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods." (second alteration in original) (quoting *Vizio*, 238 F. Supp. 3d at 1221)).

Jackson sufficiently alleges that Fandom is a video tape service provider under the VPPA.

### 2. Consumer

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). The parties dispute whether Jackson qualifies as a Fandom subscriber.

While being a subscriber does not require paying for goods or services, *Hulu I*, 2012 WL 3282960 at *8, it does require some sort of "ongoing commitment or relationship between the user[]and the entity," *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015). "[A] person who downloads and uses a free mobile application on his smartphone to view freely available content, without more, is not a 'subscriber' . . . under the VPPA." *Ellis*, 803 F.3d at 1252 (holding that plaintiff was not a subscriber where he did not create an account or provide personal information to defendant, but merely downloaded and watched videos on an application that collected his viewing data); *but see Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d

5

482, 489 (1st Cir. 2016) (holding that plaintiff was a subscriber where he merely downloaded and watched videos on an application, because, "[w]hile he paid no money, access was not free of a commitment to provide consideration in the form of [his data, collected automatically by the application], which was of value to [defendant]").

Jackson plausibly alleges that she is a subscriber under the VPPA. Jackson does not allege merely that she viewed videos hosted on a website, but rather that she created a Fandom account; became a registered user; "provided Fandom with her PII, including her name and email address"; and then used Fandom to watch videos. ECF No. 11 ¶¶ 20, 23. This is sufficient to plead that Jackson is a subscriber, and therefore a consumer, within the meaning of the statute. *See Hulu I*, 2012 WL 3282960 at *7 (holding that plaintiffs were subscribers even though they did not pay money for Hulu's video streaming service, where they signed up for accounts, became registered users, and used the service).

### 3. Disclosures Prohibited by the VPPA

The VPPA defines "personally identifiable information" to "include[ ] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Fandom argues that a Facebook Profile ID is not PII within the meaning of the VPPA, and that Jackson fails to sufficiently allege the disclosure of her video viewing history.

#### a. Facebook Profile ID

Fandom argues that Jackson fails to allege the disclosure of PII because her Facebook Profile ID, unless combined with other information, cannot be used to identify her.

The Ninth Circuit has adopted an "ordinary person" standard to determine what constitutes PII under the VPPA: "'[P]ersonally identifiable information' means only that information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)). Jackson alleges that Fandom shared her Facebook Profile ID and the title of the videos she watched with Meta. While sharing Jackson's Facebook Profile ID with Meta—which owns Facebook—would certainly

6

permit Meta to identify Jackson, such disclosure only violates the VPPA if an ordinary person would be able to identify Jackson using her Facebook Profile ID.  *See Eichenberger*, 876 F.3d at 986 (holding that a Roku device serial number does not constitute PII because an ordinary person could not distinguish the plaintiff from other Roku users without access to non-public data in Roku's control).

        Jackson alleges that a Facebook Profile ID is a unique identifier that anyone can use "to quickly and easily locate, access, and view the user's corresponding Facebook profile."  ECF No. 11 ¶ 6.  Jackson further alleges that a user's Facebook profile may contain the user's "name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts."  *Id.* ¶ 34.  From these facts, the Court may reasonably infer that an ordinary person could readily identify a specific Facebook user on the basis of a Facebook Profile ID.  *See Eichenberger*, 876 F.3d at 986 (noting that "modern technology may indeed alter—or may have already have altered—what qualifies under the statute," such that "[a] Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual"); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("*Hulu II*") ("The Facebook User ID is more than a unique, anonymous identifier.  It personally identifies a Facebook user.  That it is a string of numbers and letters does not alter the conclusion.").

        Jackson plausibly alleges the disclosure of PII under the VPPA.

        **b.**    **Viewing History**

        Fandom argues that its disclosure of which webpages Jackson visited does not constitute disclosure of her video viewing history.

        In the first amended complaint, Jackson alleges that the Pixel "logs which pages are visited, buttons are clicked, and, in this case, which videos a user requested and viewed on Fandom," and that Fandom "discloses to Meta the full name of each video a user watched, together with the user's Facebook Profile ID."  ECF No. 11 ¶¶ 36, 43.  Taking the facts alleged in the complaint as true and construing all inferences in Jackson's favor, Jackson plausibly alleges

that Fandom disclosed her video viewing history to Meta, which included her having "obtained specific video materials or services." 18 U.S.C. § 2710(a)(3).

### 4. Disclosure Incident to the Ordinary Course of Business

Fandom argues that any disclosure occurred incident to the ordinary course of business. The VPPA defines "ordinary course of business" as "debt collection activities, order fulfillment, request processing, and the transfer of ownership." 18 U.S.C. § 2710(a)(4).

Fandom contends that any disclosure to Meta is incident to the processing of users' requests to view video content on the website, because the "analytic data allows Fandom to better understand the types of requests a given user makes." ECF No. 20 at 16-17.[2] In the first amended complaint, Jackson alleges that "websites use the Pixel to collect analytical data about how users use its website and[,] in turn, are able to target more specific ads to their users," which permits websites to increase profits. ECF No. 11 ¶ 37. To the extent Fandom challenges Jackson's factual allegations regarding the purpose of Fandom's data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss. *See Hulu I*, 2012 WL 3282960, at *7 ("Whatever the merits are to [defendant's] contentions [regarding the purpose of data-sharing], [p]laintiffs allege unauthorized tracking of [their] data (including video content information). The court cannot resolve this factual issue in a motion to dismiss.").

Taking the facts alleged in the complaint as true and construing all reasonable inferences in Jackson's favor, Jackson plausibly pleads that any disclosure was not incident to the ordinary course of business.

### C. Unjust Enrichment

Fandom argues that Jackson cannot bring an unjust enrichment claim because she agreed to Fandom's Terms of Service and Privacy Policy, which Fandom contends authorize its data-sharing practices. Jackson alleges that "Plaintiff and Class members did not consent to Fandom's

---

[2] Fandom does not explain how disclosing consumer information to "better understand the types of requests a given user makes" renders such data-sharing "incident to Fandom's processing of these users' requests to view content on Fandom's site" or "incident to Fandom's delivery of content to its users." ECF No. 11 at 7-8, 16-17. It is not clear how such disclosure could be essential to delivering the video a user requests when they click play on a particular webpage.

8

disclosure of their viewing content and their identities to Meta." ECF No. 11 ¶ 45. Whether the Terms of Service and Privacy Policy—which are not before the Court, and which the Court cannot assume are binding contracts agreed to by Jackson—authorize the challenged disclosure is an issue the Court cannot decide at this stage.

Fandom also argues that Jackson has not plausibly alleged that Fandom was unjustly enriched by its data-sharing. Jackson alleges that Fandom "profit[ed] from advertisement revenue it would otherwise not have received" had it not shared users' PII without the consent required by the VPPA. *Id.* ¶ 75. Jackson thus sufficiently alleges "(1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *Florey Inst. of Neuroscience & Mental Health v. Kleiner Perkins Caufield & Byers*, 31 F. Supp. 3d 1034, 1048 (N.D. Cal. 2014). Accordingly, Fandom's motion to dismiss Jackson's unjust enrichment claim is denied.

## CONCLUSION

For the reasons set forth above, Fandom's motion to dismiss is denied.

**IT IS SO ORDERED.**

Dated: July 20, 2023

JON S. TIGAR
United States District Judge